AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Travius Eugene Roberts | ) | |
| | ) | 6:26-mj- 1775 |
| | ) | |
| | ) | |
| | ) | |

_____
_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 10, 2026_____ in the county of _____Brevard_____ in the _____Middle_____ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) | Possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Special Agent Brian Lammers, DEA
_____
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____July 2, 2026_____

_____
_Judge's signature_

City and state: _____Orlando, FL_____   Robert M. Norway, U.S. Magistrate Judge
_____
_Printed name and title_

STATE OF FLORIDA                               CASE NO.: 6:26-mj-1775

COUNTY OF ORANGE

### AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Brian S. Lammers, being first duly sworn, declare and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since August 2009. I am currently assigned to the Tampa Field Division, Titusville Post of Duty Office. As a DEA SA, I am an "investigator or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

2.      Before becoming a DEA SA, I was a sworn law enforcement officer with the St. Clair County Sheriff's Department in Belleville, Illinois for approximately 6 years. I functioned as a uniformed Deputy Sheriff and Narcotics Detective. For a portion of my tenure, I also functioned as a DEA Task Force Officer ("TFO"). Prior to my employment with the St. Clair County Sheriff's Office, I was a sworn law enforcement officer with the City of East St. Louis Police Department in East St. Louis, Illinois for approximately 6 years. During my tenure, I functioned as a TFO with the United States Marshals Service, Fugitive Task Force Operation Outlaw, for the Southern District of Illinois.

3.      As a graduate of the DEA Training Academy, I have received specialized training in areas of drug trafficking and money laundering. I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as the methods used to finance drug trafficking and launder drug proceeds. I have been trained in the methods that drug traffickers use to distribute controlled substances, and I am familiar with how drug traffickers manage, transport, and conceal the proceeds of their drug trafficking activities.

4.      During my tenure with the DEA, I have participated in narcotics investigations, and I am familiar with various methods of investigation, including, but not limited to: controlled purchases of narcotics, visual surveillance, interviewing of witnesses, executing arrest and search warrants, the use of confidential informants and sources, the use of pen registers and trap and trace devices, the installation and use of GPS mobile tracking devices, the use of electronic recording/listening devices, and the utilization of court-authorized prospective cellphone geo-location information. I have also authored affidavits in support of Title III wiretap applications and have participated in numerous Title III wiretap investigations.

5.      Additionally, I have conducted investigations to identify co-conspirators through the analysis of communication and storage devices, cellular call records, financial records, drug ledgers, and other pertinent documents. I have also participated in the debriefings of many individuals who agreed to cooperate with the government after their arrest about violations of Title 21 and Title 18 of the United

2

States Code.

## PURPOSE OF AFFIDAVIT

6.     This affidavit is being submitted to establish probable cause in support of a criminal complaint against Travius Eugene ROBERTS for possession with intent to distribute a controlled substance, specifically 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), occurring in the Middle District of Florida.

7.     This affidavit is based upon my personal knowledge, training, and experience as a law enforcement officer; information that I received from other law enforcement officers and agents; and information received from other investigative means, including physical and electronic surveillance, controlled purchases of narcotics, and information from a confidential source. The statements contained in this affidavit are based, in part, on information from other DEA and Federal Bureau of Investigation ("FBI") SAs and TFOs, and members of the Florida Highway Patrol ("FHP") and Brevard County Sheriff's Office ("BCSO"). Because this affidavit is being submitted solely for establishing probable cause for a criminal complaint against ROBERTS, I have not included every fact or facet of the investigation known to me, only those facts necessary to support a criminal complaint.

## CONFIDENTIAL SOURCE

8.     This investigation started in April 2026 after an FBI confidential source (CS) reported that ROBERTS was distributing methamphetamine, cocaine, and fentanyl in the Brevard County, Florida area.

3

9.      ROBERTS is a multi-convicted felon, and his criminal history includes arrests and convictions for, but not limited to, trafficking in amphetamines, trafficking in cocaine, trafficking in MDMA, felon in possession of firearm and/or ammunition, willful child abuse, resisting officer with violence, battery on law enforcement officer, carrying concealed firearm, sale/manufacture/delivery of cocaine, possession of cocaine, fleeing/elude law enforcement, and felony battery. According to the State of Florida Department of Corrections website, ROBERTS was released from state prison on March 27, 2025. This investigation revealed that ROBERTS is currently unemployed.

10.     The CS is providing information and services related to this investigation to the DEA and FBI in hopes of receiving favorable consideration from the government prior to being charged with a drug trafficking crime. The CS's criminal history consists of misdemeanor convictions, which include possession of drug paraphernalia.

11.     During the investigation, the information provided by the CS about ROBERTS has been corroborated by law enforcement officers and found to be accurate and credible through surveillance, controlled telephone calls/text messages, and two successful controlled purchase operations.

12.     In addition to the controlled purchase operations and surveillance conducted on ROBERTS, I have also obtained cellular location pings that have provided additional evidence of ROBERTS's movements and corroborated ROBERTS's drug trafficking related activities. This located data was obtained via a

4

federal search warrant issued in the Middle District of Florida. *See* Case No. 6:26-mj-1617-NWH.

## FACTS ESTABLISHING PROBABLE CAUSE

13.    In April 2026, the DEA and FBI partnered in a joint investigation into the drug trafficking related activities of ROBERTS in Brevard County, Florida, within the Middle District of Florida.

14.    In May 2026, the DEA and FBI utilized the CS to conduct two controlled purchases of methamphetamine and cocaine from ROBERTS.

15.    Prior to the drug transactions, DEA provided the CS with DEA Official Advanced Funds ("OAF") that were used to purchase the drugs. Law enforcement also equipped the CS and CS's vehicle with audio and video recording devices so that a recording of the transaction could be obtained as evidence. Law enforcement also searched the CS and CS's vehicle for contraband before and after the transactions, which yielded negative results for contraband.

16.    After each deal, agents collected the drugs and conducted a field test. The drugs were sent to the DEA laboratory for analysis, and the lab results confirmed the drugs to be methamphetamine and cocaine.

17.    As a result of this investigation, agents established probable cause that ROBERTS was utilizing his residence, XXXX Reverend Nathaniel L Harris Street, Melbourne, Florida 32901, to facilitate his drug trafficking activities. ROBERTS resided at the residence with his girlfriend. Based on this information, I applied for and obtained a federal search warrant for ROBERTS's residence. On June 29, 2026,

5

the search warrant was signed and issued by the Honorable Robert M. Norway, United States Magistrate Judge in the Middle District of Florida. *See* Case No. 6:26-mj-1748.

18.    On July 1, 2026, law enforcement observed ROBERTS leaving his residence. Law enforcement attempted to conduct surveillance on ROBERTS, but lost sight of him. Law enforcement relocated ROBERTS as he was leaving XXXX Saxon Street, Melbourne, Florida in a vehicle. Law enforcement stopped ROBERTS and subsequently secured him into handcuffs and placed him under arrest. Once ROBERTS was in custody, members of the Melbourne Police Department ("MPD") executed the search warrant at ROBERTS's residence.

### May 11, 2026 – Controlled Purchase of Eight Ounces of Methamphetamine and One-Half Ounce of Cocaine

19.    On May 11, 2026, the CS purchased eight ounces of methamphetamine and one-half ounce of cocaine from ROBERTS for $1,350.00. The CS communicated with ROBERTS, who was using telephone number XXX-XXX-5658, to set up the drug transaction. During the communication, arrangements were made for the CS to meet with ROBERTS around an ice cream shop in Melbourne, Florida to conduct the drug transaction. The text messages and/or telephone calls between the CS and ROBERTS setting up the controlled purchase were saved as evidence.

20.    At approximately 2:21 p.m., the CS called ROBERTS to finalize the purchase of the methamphetamine and cocaine. During the call, the CS asked ROBERTS if he/she could come see ROBERTS. ROBERTS advised the CS that he

was getting his car cleaned, and ROBERTS asked the CS what he/she was talking about. The CS told ROBERTS that he/she needed "8" and "14 of the girl" (referring to 8 ounces of methamphetamine and 14 grams of cocaine) from ROBERTS. ROBERTS advised the CS to give him about 30 minutes until his car was cleaned. ROBERTS further advised the CS that he would probably meet with the CS in the area of an ice cream shop on N Harbor City Blvd. in Melbourne, Florida.

21.    At approximately 3:10 p.m., the CS received an incoming call from ROBERTS. During the call, ROBERTS asked the CS where he/she was at. The CS advised ROBERTS that he/she was about 10 minutes away from the ice cream shop.

22.    Prior to the deal, law enforcement established surveillance in the area of the ice cream shop in anticipation of observing ROBERTS arrive at that location to conduct the drug transaction with the CS. A second team of agents prepared the CS for the deal.

23.    The CS departed the meet location and drove directly to the immediate area of the ice cream shop. Upon arrival, the CS parked in the strip mall parking located next to the ice cream shop while awaiting ROBERTS's arrival.

24.    At approximately 3:38 p.m., the CS received an incoming call from ROBERTS. During the telephone call, ROBERTS told the CS to follow him. ROBERTS had arrived at that location driving a gray Genesis 4-door passenger vehicle bearing Georgia registration "DCZ3060." The Genesis was rental car that was later determined to be rented by ROBERTS.

25. The CS followed ROBERTS to an apartment complex parking lot located on Ella Street in Melbourne, Florida. Upon arrival, the CS got into the passenger-side front seat of ROBERTS's vehicle. The CS and ROBERTS conducted the drug transaction inside ROBERTS's vehicle. ROBERTS provided the CS with a clear plastic baggie that contained a crystalized substance (suspected methamphetamine) and a clear plastic baggie containing a white powdery/chunky substance (suspected cocaine). The CS provided ROBERTS with the $1,350.00 DEA OAF for the suspected methamphetamine and cocaine. An audio/video recording of the deal was obtained as evidence.

26. The CS departed the area and drove to a debriefing location where agents collected the suspected methamphetamine and cocaine. The CS was debriefed for information about what occurred during the drug transaction. The CS provided information that was consistent with what was observed during surveillance and the audio and video recordings.

27. ROBERTS departed the area after the deal and drove south on US1 to University Blvd., where agents terminated surveillance. Agents conducted a drive-by of ROBERTS's residence a few minutes later and observed the Genesis parked in the driveway. The Genesis appeared to be unoccupied.

28. The suspected methamphetamine and cocaine were sent to the DEA Southeast Regional Laboratory for analysis. A chemist determined the suspected methamphetamine consisted of 202.0 grams of methamphetamine with 100% purity.

A chemist determined the suspected cocaine consisted of 12.38 grams of a substance containing cocaine hydrochloride.

### May 27, 2026 – Controlled Purchase of Eight Ounces of Methamphetamine and One-Half Ounce of Cocaine

29. On May 27, 2026, the CS purchased eight ounces of methamphetamine and one-half ounce of cocaine from ROBERTS for $1,350.00. The CS communicated with ROBERTS, who was using telephone number XXX-XXX-5658, to set up the drug transaction. During the communication, final arrangements were made for the CS to meet with ROBERTS at a gas station parking lot in Melbourne, Florida to conduct the drug transaction. The text messages and/or telephone calls between the CS and ROBERTS setting up the controlled purchase were saved as evidence.

30. Prior to the deal, agents established surveillance on ROBERTS's residence. Additionally, DEA Airwing assisted with aerial surveillance. Another team of agents prepared the CS for the deal.

31. At approximately 12:38 p.m., the CS called ROBERTS to finalize the purchase of the methamphetamine and cocaine. During the call, the CS asked ROBERTS if he/she could come see ROBERTS. ROBERTS asked the CS what he/she was trying to get. The CS told ROBERTS that he/she needed "8" and "14" (referring to 8 ounces of methamphetamine and 14 grams of cocaine). ROBERTS advised the CS that he needed at least 30 minutes because he was taking his daughter to get her hair done. ROBERTS further indicated to the CS that he had the drugs

9

available for the CS to purchase. The CS told ROBERTS that he/she would call him back.

32.    At approximately 12:50 p.m., DEA TFO Kyle Schuck observed ROBERTS arrive at his residence in a black Jeep Wagoneer bearing Florida registration "FL43430" and park in the driveway. The Jeep was rental car that was rented by ROBERTS. Law enforcement had knowledge that ROBERTS rented the Jeep prior to this controlled purchase operation. ROBERTS exited the driver's door of the Jeep and walked up to the front door of his residence and went inside.

33.    At approximately 1:13 p.m., the surveillance team observed ROBERTS walk from the front door of his residence over to the Jeep. ROBERTS got into the driver's seat of the Jeep and departed the area. The surveillance team followed ROBERTS away from the residence. At the same time, the CS called ROBERTS to get an update on when they were going to meet to conduct the drug transaction. During the call, the CS asked ROBERTS if he was ready. ROBERTS advised that he on "95" past Rockledge because his daughter's appointment was in Cocoa. ROBERTS told the CS that he was going to get off at the Eau Gallie exit and they could meet anywhere in that area. ROBERTS agreed to meet the CS at a gas station on W Eau Gallie Blvd. in Melbourne, Florida in about 15 minutes.

34.    ROBERTS drove from his residence to a car wash in Cocoa, Florida. ROBERTS was observed walking in and out of the storage/car wash bays of the business at that location. At approximately 2:41 p.m., ROBERTS departed the car wash area, followed by the surveillance team. A few minutes later, the CS called

10

ROBERTS back. During the call, ROBERTS told the CS that he was on the way and agreed to meet with him/her at the previously arranged location.

35.    BCSO Special Investigations Unit ("SIU") Agent James Christoffel, acting in an undercover capacity, drove the CS from the meet location to the gas station parking lot and parked, awaiting ROBERTS's arrival.

36.    The surveillance team followed ROBERTS from the car wash to the immediate area of the arranged deal location. At approximately 3:04 p.m., the CS received an incoming call from ROBERTS. During the telephone call, ROBERTS told the CS that he was at the light (referring to the intersection where the gas station is located). ROBERTS switched the deal location and told the CS to go to a different gas station.

37.    BCSO SIU Agent Christoffel and the CS drove to the other gas station parking lot. Upon arrival, BCSO SIU Agent Christoffel parked next to ROBERTS at the gas pumps. The CS got into the passenger-side rear seat of ROBERTS's vehicle. The CS and ROBERTS conducted the drug transaction inside ROBERTS's vehicle. ROBERTS provided the CS with a clear plastic baggie that contained a crystalized substance (suspected methamphetamine) and a clear plastic baggie containing a white powdery/chunky substance (suspected cocaine). The CS provided ROBERTS with the $1,350.00 DEA OAF for the suspected methamphetamine and cocaine. An audio/video recording of the deal was obtained as evidence.

11

38.     BCSO SIU Agent Christoffel observed ROBERTS as the driver of the Jeep. Additionally, BCSO SIU Agent Christoffel observed an unknown front-seat passenger in the Jeep.

39.     BCSO SIU Agent Christoffel and the CS departed the area and drove to a debriefing location where agents collected the suspected methamphetamine and cocaine. The CS was debriefed for information about what occurred during the drug transaction. The CS provided information that was consistent with what was observed during surveillance and the audio and video recordings.

40.     ROBERTS departed the deal location area and drove directly to his residence and parked in the driveway. The surveillance team observed ROBERTS and the unknown passenger exit the Jeep, walk up to the front door of his residence, and go inside.

41.     The suspected methamphetamine and cocaine were sent to the DEA Southeast Regional Laboratory for analysis. A chemist determined the suspected methamphetamine consisted of 211.7 grams of methamphetamine with 98% purity for a total of 207.4 grams of pure methamphetamine. A chemist determined the suspected cocaine consisted of 13.49 grams of a substance containing cocaine hydrochloride.

### June 10, 2026 – Traffic Stop of ROBERTS and Seizure of Two Kilograms of Cocaine

42.     On June 9, 2026, the CS advised me that he/she had talked with ROBERTS earlier that day. The CS stated that ROBERTS told him/her that

12

ROBERTS was waiting to hear from his source of supply so he can re-up his supply of drugs. The CS advised that ROBERTS indicated that he should be good in the next day or two. The CS advised that he/she was unaware of who ROBERTS's source of supply was. The CS expressed that conversations he/she had in the past with ROBERTS indicated that ROBERTS's source of supply is down south, possibly in the Miami, Florida area.

43. On June 10, 2026, the cellular location pings from ROBERTS's cellular telephone showed that his cellular telephone traveled from the Brevard County, Florida area to the Miami, Florida area. The cellular location pings indicated that ROBERTS's cellular telephone stayed in the Miami, Florida area for less than an hour before traveling back toward Brevard County, Florida.

44. DEA initiated surveillance on ROBERTS as he traveled back into the Brevard County, Florida area on Interstate 95 from the Miami, Florida area. ROBERTS was driving a silver Jeep Cherokee (Jeep) bearing Florida registration "DX65HS." This was a rental vehicle rented by ROBERTS on that date.

45. The DEA contacted the FHP and provided information about ROBERTS's drug trafficking related activities and that ROBERTS was possibly transporting drugs from down south to the Brevard County, Florida area.

46. At approximately 11:35 p.m., FHP Trooper Logan Koller conducted a traffic stop on the Jeep for a traffic violation shortly after the Jeep exited Interstate 95 onto Palm Bay Road in Melbourne, Florida. The driver of the Jeep was identified as

13

ROBERTS, and the front-seat passenger was later identified as D.L.B. FHP Trooper Koller was assisted by BCSO deputies.

47.     During the traffic stop, FHP Trooper Koller detected the odor of marijuana coming from the vehicle. When he advised ROBERTS and D.L.B. of the odor of marijuana, ROBERTS and D.L.B. each provided a package of suspected marijuana to FHP Trooper Koller from inside the vehicle, which were in factory packaging that appeared to be from a marijuana dispensary. ROBERTS and D.L.B. advised that they have medical marijuana cards but could not produce them at the time of the traffic stop. A narcotics-detecting canine conducted a free-air sniff of the vehicle but did not give a positive alert for the presence of drugs. During this time, FHP Trooper Koller was able to verify through his dispatch that ROBERTS had a valid medical marijuana card. FHP Trooper Koller did not check whether D.L.B. had a valid medical marijuana card.

48.     Due to the odor of marijuana and because neither ROBERTS nor D.L.B. produced a medical marijuana card despite each possessing marijuana, coupled with the information provided by the DEA about ROBERTS's drug trafficking related activities discussed above, a probable cause search of the Jeep was conducted. The search resulted in the seizure of approximately two kilograms of suspected cocaine inside the trunk side panel (driver's side) by the spare tire. ROBERTS and D.L.B. were detained and secured in the backseat of a BCSO patrol vehicle.

14

49.     While in the backseat of the BCSO patrol vehicle, ROBERTS was observed on the video camera in the patrol vehicle elbowing D.L.B. to get his attention. ROBERTS then shook his head from side to side and appeared to point out the camera to D.L.B. Additionally, ROBERTS whispered to D.L.B. on more than one occasion while they were inside the back of the patrol vehicle. It appeared that based on ROBERTS's actions in the backseat of the patrol vehicle, he was telling D.L.B. that they were being recorded and not to talk.

50.     FHP Trooper Koller advised ROBERTS and D.L.B. of their Miranda Rights and Warnings while they were sitting together inside the patrol vehicle. ROBERTS and D.L.B. indicated they understood their rights. ROBERTS and D.L.B. both advised that they knew nothing about the drugs that were located in the Jeep. ROBERTS stated that he had rented the Jeep around 4:00 p.m. to 5:00 p.m. that day. FHP Trooper Koller asked ROBERTS and D.L.B. where they went that day. ROBERTS advised they did not go anywhere and were just coming from getting something to eat, and ROBERTS indicated that he was on his way home.

51.     ROBERTS and D.L.B. were released from the traffic stop pending further investigation. A field test was conducted on both kilograms of suspected cocaine, which indicated a presumptive identification for cocaine. The two kilograms of suspected cocaine were sent to the DEA Southeast Regional Laboratory for analysis. The analysis of the suspected cocaine is still pending.

15

**Additional Drug-Related Conversations**

52.    On June 23, 2026, the CS contacted me. The CS advised that he/she was contacted by ROBERTS who told the CS that he received a shipment of methamphetamine and it was "24" for the "whole thing" (referring to $2400.00 for each pound of methamphetamine).

**July 1, 2026: Arrest of ROBERTS**

53.    As stated above, on June 29, 2026, the DEA obtained a federal search warrant for ROBERTS's residence, XXXX Reverend Nathaniel L Harris Street, Melbourne, Florida.

54.    On July 1, 2026, members of the DEA, FBI, and MPD conducted an operation to arrest ROBERTS.

55.    Members of the MPD conducted a stop of ROBERTS as he was departing the driveway of XXXX Saxon Street, Melbourne, Florida. ROBERTS was the driver and sole occupant of the vehicle. ROBERTS was secured into handcuffs and placed into the back seat of an MPD patrol vehicle.

56.    A probable cause search of ROBERTS's vehicle in connection with his arrest resulted in the seizure of approximately 28 grams of suspected methamphetamine inside a clear plastic baggie and approximately 31 grams of suspected cocaine inside a clear plastic baggie laying on the driver's side rear floorboard. Additionally, law enforcement located the cellular telephone with the number XXX-XXX-5658 laying on the passenger front seat of the vehicle ROBERTS

16

was in. This was the telephone number the CS called ROBERTS on to arrange the aforementioned controlled purchases.

57.    A field test of the suspected methamphetamine and suspected cocaine was conducted, utilizing a TruNarc digital narcotic analyzer, which returned a presumptive identification of methamphetamine and cocaine.

58.    After law enforcement took ROBERTS into custody, members of the Melbourne PD SWAT executed the search warrant at ROBERTS's residence.

### July 1, 2026: Federal Search Warrant at XXXX Reverend Nathaniel L Harris Street, Melbourne, Florida 32901

59.    Members of the MPD SWAT executed the search warrant at ROBERTS's residence. The residence was occupied by two children. During the search of the residence, law enforcement located 5 clear plastic baggies each containing suspected crack cocaine (approximately 102 grams) and 1 clear plastic baggie containing suspected cocaine (approximately 19 grams) inside a wash mitt on a shelf in the garage. Law enforcement located a Kahr K9 semi-automatic pistol with a magazine that contained 6 rounds of 9mm ammunition inside a dresser drawer in ROBERTS and his girlfriend's bedroom. Law enforcement located several documents with ROBERTS name on them inside the bedroom. Law enforcement located manufacturing and packaging materials in the kitchen area. Law enforcement located a large amount United States currency in a spare bedroom.

59.    The suspected crack cocaine and cocaine was field tested, utilizing a TruNarc digital narcotic analyzer, which returned a presumptive identification of

17

cocaine base and cocaine. The suspected crack cocaine and cocaine were sent to the DEA Southeast Regional Laboratory for analysis.

60.    During a post-*Miranda* statement, ROBERTS acknowledged being a methamphetamine, cocaine, and crack cocaine dealer. ROBERTS admitted ownership and knowledge of the crack cocaine inside the wash mitt in the garage.

61.    ROBERTS also admitted driving to the Miami/Fort Lauderdale area with D.L.B. and another individual he knew as "Bear." ROBERTS stated that the two kilograms of cocaine that were seized by law enforcement from his rental vehicle were Bear's. ROBERTS stated Bear met with someone down there and purchased the drugs. ROBERTS initially stated he was unaware of what Bear purchased down there, but he had knowledge that it was drugs. ROBERTS stated Bear put it in the trunk area of his rental vehicle. ROBERTS stated that he dropped Bear off in the Vero area on the way back, and Bear left the cocaine inside his vehicle. ROBERTS stated that he did not have knowledge that the cocaine was left inside his vehicle until law enforcement located it. ROBERTS stated that he would have received a half kilogram of the cocaine that was seized from the vehicle. ROBERTS stated Bear owed him money from a vehicle and necklace that he sold Bear prior to going to prison the last time.

## CONCLUSION

62.     Based on information set forth above, I submit that probable cause exists that on or about June 10, 2026, ROBERTS possessed with intent to distribute a controlled substance, specifically 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

Respectfully submitted,

Special Agent Brian Lammers
Drug Enforcement Administration

Affidavit sworn to before me and signed
in my presence this _2nd_ day of July,
2026.

HONORABLE ROBERT M. NORWAY
United States Magistrate Judge

19